MICROSTRATEGY, INC., Plaintiff,

v.

**BUSINESS OBJECTS, S.A., et al., Defendants.**

**No. CIV.A. 2:01CV826.**

United States District Court, E.D. Virginia, Norfolk Division.

Aug. 6, 2004.

Thomas J. Cawley, Ingo Frank Burghardt, Hunton & Williams, McLean, VA, Gregory N. Stillman, Benita Webster Ellen, Hunton & Williams, Kenneth Reed Mayo, Best Law Offices PC, Norfolk, VA, Peter Edward Moll, Joseph Phillip Lavelle, Brian D. Wallach, Paul Yang, Howrey Simon Arnold & White LLP, Washington, DC, James Frederick Valentine, Howrey Simon Arnold & White ·LLP, Menlo Park, CA, for Plaintiff.

Dana Johannes Finberg, David James Sensenig, LeClair Ryan PC, Richmond, VA, Ray Webb King, LeClair Ryan PC, Norfolk, VA, Gary H. Ritchey, Daniel J. Furniss, Theodore G. Brown, III, Townsend Townsend & Crew LLP, Palo Alto, CA, Ian Lawrence Saffer, Townsend Townsend & Crew LLP, Denver, CO, for Defendants.

### OPINION AND ORDER

FRIEDMAN, District Judge.

This matter is before the court on the parties' cross motions for summary judgment. The plaintiff, MicroStrategy, Inc., argues summary judgment should be

granted on its claim of patent infringement, while the defendants, Business Objects, S.A. and Business Objects Americas, Inc.,[1] argue that summary judgment should be granted on the basis of noninfringement, invalidity, or inequitable conduct. The court heard oral argument in April, 2004. For the reasons stated in greater detail below, the plaintiff's motion for summary judgment of infringement is DENIED, and the defendants' motion for summary judgment of noninfringement is GRANTED. Additionally, the court exercises its discretion, and the defendants' claim of invalidity is DISMISSED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On October 30, 2001, MicroStrategy filed the instant action against Business Objects alleging infringement of two of its patents, United States Patent Numbers 6,260,050 ("the '050 patent") and 6,279,033 ("the '033 patent"), as well as other state law tort claims. MicroStrategy is the assignee of these patents.

On January 25, 2002, Business Objects filed a Request for Reexamination of the patents with the Patent and Trademark Office (PTO), based on the plaintiff's own prior art public documents that it allegedly failed to disclose to the PTO during the prosecution of its patent applications. The PTO granted the request and concluded that the patents were valid. Litigation of the patent portion of this action had been stayed during reexamination, and the court lifted the stay upon conclusion of the reexamination. Subsequently, the infringement claim relating to the '033 patent was voluntarily dismissed, and only the '050 patent remains at issue. MicroStrategy maintains that the defendants' product infringes claims 1, 4, 8, 11, and 15 of that patent. Claims 1, 8, and 15 are independent claims, all using similar language.

Claim 1 details a system, claim 8 is a method, and claim 15 is a computer program for the system or method.

In January, 2004, the court conducted a *Markman* hearing and issued its construction of the disputed claim terms in March, 2004. Subsequently, the parties filed cross-motions for summary judgment related to the infringement claim. The defendants also filed a motion for summary judgment arguing that the '050 patent was invalid or unenforceable. The court heard oral argument on the motions for summary judgment on May 28, 2004.

## II. ANALYSIS

### A. *Summary Judgment Standard*

In patent cases, as well as in all other cases, summary judgment is appropriate when it is apparent from the entire record, viewed in light most favorable to the nonmoving party, that there are no genuine disputes of material fact. *See Clark v. Alexander,* 85 F.3d 146, 150 (4th Cir.1996); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). In other words, summary judgment is not appropriate where there is sufficient evidence favoring the nonmoving party to permit a reasonable jury to return a verdict for that party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A properly supported motion for summary judgment may not be defeated by "the mere existence of some alleged factual dispute between the parties." *Id.* at 247–48, 106 S.Ct. 2505. The requirement is that there are no genuine issues of material fact. *See id.* Entry of summary judgment is mandated "against a party who fails to make a sufficient showing to

---

**1.** The court will refer to the two defendants    collectively as Business Objects.

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Although a patent infringement analysis usually involves both questions of fact and issues of law, summary judgment on the issue of noninfringement nevertheless may be proper. *See Nike, Inc. v. Wolverine World Wide, Inc.,* 43 F.3d 644, 646 (Fed.Cir.1994); *Chemical Eng'g Corp. v. Essef Indus., Inc.,* 795 F.2d 1565, 1571 (Fed.Cir.1986). A good faith dispute about the meaning and scope of asserted claims does not, in and of itself, create a genuine dispute to preclude summary judgment in patent cases. *See Lantech, Inc. v. Keip Mach. Co.,* 32 F.3d 542, 546 (Fed.Cir.1994).

Claim construction is a matter of law for the court ·to decide. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995) (*en banc*), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Claims are construed from the perspective of a person of ordinary skill in the art at the time of the invention. *Id.* at 986. Determination of infringement is a two-part process whereby the claims are first construed as a matter of law, then the claims are applied to the accused device—a question of fact. *See EMI Group North America, Inc. v. Intel Corp.,* 157 F.3d 887, 891 (Fed.Cir.1998); *Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1476 (Fed.Cir.1998). "Where the parties do not dispute any relevant facts regarding the accused product, ... but disagree over possible claim interpretations, the question of literal infringement collapses into [one of] claim construction and is amenable to summary judgment." *General Mills, Inc. v. Hunt–Wesson, Inc.,* 103 F.3d 978, 983 (Fed.Cir.1997); *Athletic Alternatives, Inc. v. Prince Mfg., Inc.,* 73 F.3d 1573, 1578 (Fed.Cir.1996); *see also Phonometrics, Inc. v. Northern Telecom Inc.,* 133 F.3d 1459, 1464 (Fed.Cir.1998) ("Disputes concerning the meaning of claims do not preclude summary judgment, because the resolution of those disputes is part of the process of claim interpretation, a matter of law.").

In the present case, the parties agree that there is no dispute regarding the operation of the accused product. The court also concurs that the manner in which the defendants' software functions is clear. Accordingly, summary judgment is appropriate in this case. The court has construed the claim terms in question; therefore, what remains is for the court to compare the software to the claims and determine whether every element of the claims can be found in the software either literally or by virtue of the doctrine of equivalents, if applicable. The court notes that the parties do appear to disagree about how the claim elements are to be interpreted, despite the court having defined the terms that the parties considered to be in dispute.

The parties agree that the independent claims are essentially identical and that the court's determination as to one will attach to all, including, of course, the dependent claims at issue. Consequently, the court will analyze infringement by referring to claim 8, which was the focus of the parties' briefs.

**B.   *The Patent and the Accused Product***

The patent in question is titled a "System and method of adapting automatic output of service related OLAP reports to disparate output devices." It is apparent from the patent specification that the patentee believed the inventive aspect of the system was its ability to send output from a database to different devices. The better part of the preferred embodiment is devoted to describing the numerous ways in which output could be formatted in order to ensure that the receiving output

device could display the data in a format comprehendible to the user. The patent was originally drafted quite broadly and apparently was intended to cover just about any system that sat between a database and an output device and managed the generation and transmission of database output to recipient devices. In order to receive a patent, however, the patentees were forced to narrow that language, focusing on the portions of the specification that described the subscription-based aspects of the system.

Claim 8 recites the following:

A method for generating output from an on-line analytical processing system to user output devices comprising the steps of:

(1)[2] processing at least one scheduled service in an on-line analytical processing system according to a schedule established for the service and generating a service output, each service comprising at least one query to be performed by the on-line analytical processing system and at least one user device subscribed to that service;

(2) enabling a plurality of subscribers to subscribe to the scheduled service and enabling the subscriber to specify at least one user output device at which to receive service outputs from the service;

(3) wherein each user device subscribed to that service is associated with a device-specific style that designates the format in which that particular type of user device is to output to the service outputs to a user to maintain the integrity of the service outputs;

(4) determining whether to forward the generated output to one or more user devices based on output conditions specified for each user device subscribed to the service;

(5) creating a device-specific formatted output for each user device subscribed to the service selected to receive the output according to a selection of predefined values specified for each of a plurality of predefined parameters provided by the style specified for the user output device, and

(6) automatically forwarding a device-specific formatted service output to each of the user output devices selected to receive the output for that service;

(7) wherein the determining step comprises determining whether each user device subscribed to the service is an alert subscription or a periodic subscription and selecting the user device if it is a periodic subscription or if an alert condition specified in the alert subscription has been satisfied.

'050 Patent, Cols. 18:55–19:20.

In the preferred embodiment, and other variants of the invention, a "service" is set up, which is a query or set of queries of a database, the results of which are then packaged for delivery to anyone or thing that subscribes to that service. In other words, a number of end users are subscribed to receive the particular output generated by a particular service. Often, a particular user may not receive the output at the same frequency as other users, based on modifiable features of the subscription. When the system has determined that a user or user device is to receive output, it formats that output for delivery to that particular user device and transmits the output.

For example, a company's sales force may need to receive sales figures for a particular widget once a week. Some members of the sales force may only want

---

**2.** The court has numbered each element for ease of identification and will refer to each as "element three," "element four," etc.

to see these figures every third week. The system would permit someone to set up a query on the database that produced these sales figures weekly, but only sent this output to subscribers when the subscribers needed it weekly, every third week, whenever. The results of the database query—the sales figures—would be formatted and transmitted to each user at the time they wanted it and at the device that was designated to receive that information. MicroStrategy has often trumpeted its software's ability to send such information via fax, phone, personal digital assistants, email, or any other method.

Business Objects developed a product, Broadcast Agent Publisher ("Publisher"), that operates in a manner similar to MicroStrategy's software, which essentially is the preferred embodiment of the patent.[3] In Publisher, users are subscribed to "publications," which are similar to services.[4] A publication is a "broadcast" of information to a group of "recipients." The creator of the publication determines who is a recipient of the publication and when it is sent. The publication sent to a recipient is simply information obtained through a query or queries on a database. The Publisher software is only designed to be run with email. In other words, the recipient output device is simply an email address. There are, however, several different formatting options for such email, depending upon the type of email server employed.

### C. *The Defendants' Argument*

As noted, in order for there to be infringement, the accused product must read on each element of the patent. In the instant case, there are seven such elements. The defendants have focused their argument on four of these elements, in effect addressing two issues: the use of device-specific styles, and the determination of whether to send output to a particular subscriber. The first matter concerns elements three and five of the claims, while the second matter concerns elements four and seven of the claims. While the defendants' argument regarding claim elements three and five was raised in response to the plaintiff's motion for summary judgment, the court concludes that it may properly consider and rely on this argument despite the fact that it was not raised as part of the defendants' formal motion for summary judgment of non-infringement.

A court can enter summary judgment against a party sua sponte. In the present case, the court has not even gone that far. Both parties have filed motions for summary judgment, and the court is simply considering an argument not formally raised in a party's opening brief. The plaintiff has not been disadvantaged for two reasons: First, the plaintiff had ample opportunity to address the argument in its reply brief and at the hearing on this matter. In fact, it was the defendants who were unable to brief the issue fully, because they would have been entitled to a rebuttal brief as well had they relied on this argument in the brief in support of their motion. Second, the issue raised is a legal one, resting on an interpretation of the claim language. In other words, there are no additional facts that the plaintiff might have offered to counter the defendants' argument or give rise to a dispute only resolvable through trial.

3. While MicroStrategy accuses Business Objects of infringement, in part, through the interaction of Publisher with other Business Objects applications, the court focuses on the functioning of Publisher for purposes of this Opinion and Order.

4. The court uses these terms interchangeably in its discussion.

## 1. The Device–Specific Style

Element three is essentially self-explanatory. It provides for a "device-specific style" that determines the format in which an output device receives and displays output. In other words, the style dictates the parameters that enable successful viewing of service output through an output device. Element five describes the manner in which this device style facilitates the proper formatting of output for receipt by an output device.

Element three states that "each" user device is "associated" with a device-specific style. The primary dispute between the parties is whether the "association" described in element three may be a "global" or "subscriber-wide" association of devices to one style or whether the patent requires a system to make this association on a device-by-device basis. In other words, must an infringing system carry an internal list of subscriber output devices and for each device in the list know what style that device requires? Alternatively, does a system possess this element of the claim if it carries an association between a style and a group of subscribers or the service itself In the latter case, the system must assume that all the subscribing devices will receive and display output correctly according to the style specified for the particular service without actually knowing what type of output devices are subscribed and what style each device requires for proper receipt and display of the service output.

Business Objects contends that its software application, Publisher, makes no such "association" between each output device subscribed to a service and a particular device-specific style. Instead, it is argued that the association that does occur in Publisher is one between a device style and the service as a whole—the second permutation described above. In other words, the distinction between the '050 patent and the allegedly infringing software, is that the patent requires that each device be explicitly assigned a particular style type, whereas Publisher does not associate styles with devices. In Publisher, the creator of the service or publication simply picks the email server profile or format to be used to transmit the output to the intended email addresses. At best, the "association" is between the style and the server type. If a company runs a Lotus Domino email server, then the service creator must pick that server type in order to ensure that the output is successfully sent to the intended email addresses. If a company runs Domino and Microsoft Exchange, then the publication creator must create two separate publications in order to transmit to all recipients if some recipients are on one server and some on the other. By contrast, the patent's primary touted benefit is that it permits the use of only one service despite the existence of multiple device types with varying formatting requirements.

The defendants' argument demands that a system falling within the scope of the patent has a list of subscribing output devices and for each carries a device-style association. The list might state: device 1 = style X, device 2 = style Y, device 3 = style Z.[5] In some instances, if only one device type is employed, it might simply state: device 1 = style X, device 2 = style X, device 3 = style X. When generating output from a service, the system would walk through its list of subscribing devices, identify the device, find the associated style, format output for that particular device based on the associated style, send the output, then proceed to the next device. The exact nature of the steps taken is

5. The court is obviously simplifying what actually occurs within a computer system.

unimportant. The crucial detail is the association of each device with a style.

Publisher does not carry an association between a device and a device style because it assumes that all devices subscribed to a publication are of the same device type. Rather, it does not know what device is subscribed, it simply knows the single style in which it is supposed to transmit all output. Consequently, the system is required to know only one style—based on the server type and certain related options selected by the creator of the publication and associated with the publication itself, not the recipients. At no point does the system, publication creator, or subscriber/recipient ever link a recipient's output device with a format or style appropriate for that device. Conceptually, Publisher does not carry a list like the one described above. Instead, the system simply knows: service 1 = style X. As a result, when generating the output, the system simply formats the publication once and sends identical output multiple times to the recipient devices, regardless of whether there is more than one recipient device type.

The plaintiff would argue that the patent does not require such a technical distinction. Instead, the patent simply mandates that the system transmit output in a style that is meaningful to recipient devices. The simple association of a style with a service inherently can be interpreted as making an implied association between each device and that particular device style, even if there is no explicit "list" of associations. The style is device-specific, as required by the claim language, inherently because it permits output to be correctly displayed properly, and there is no meaningful distinction between a list associating a style with all subscribing devices at once and a list that breaks that association down on an individualized level. In other words, according to the plaintiff, a

system that characterizes the formatting as "all devices = style X" or "publication 1 = style X," cannot be meaningfully distinguished from one that states "device 1 = style X, device 2 = style X, and device 3 = style X."

The court observes that the parties asked the court to address only a handful of one- or two-word terms during the claims construction phase of this litigation. In the past, the court's experience has been one where it is asked to address far greater portions of particular claim elements. In this case, the court assumed that the portions of the claim elements ignored during claims construction were amenable to an undisputed "plain meaning." Clearly, however, the parties do disagree regarding the meaning of the claim elements as a whole, even when read in light of the construed claim terms. In their present arguments to the court, the parties have not engaged in an analysis of the claim language, specification, and prosecution history in order to illuminate the basis for each party's construction of the claim elements at issue, handicapping the court somewhat. Nevertheless, the court will attempt to construe the claim elements in their entirety. Based on the plain meaning of the claim language, as well as inferences gleaned from the specification, the court agrees with the defendants.

### 2. Analysis

■ Within the Business Objects software, the publication or service itself carries a particular format designation based on the "style" specified by the creator of the service. The format is indirectly related to the type of device that the publication's recipients are using; however, it does not actually make any association between the devices and the format. The system does not know what the devices are or the styles that each device needs to

440

properly receive and display output. As the defendants have characterized it, Publisher associates a publication with recipient output devices and associates a publication with a particular style or format in which it will be transmitted; it does not associate each device with a style.

By contrast, the patent calls for a system whereby there is an association made at the level of the devices themselves, not the service or publication level. In other words, the creator of a service operating within the scope of the claim language does not specify what the format is for the service. Instead, he creates the service and then specifies who the subscribers are. Based on the subscriber list or the list of subscribing devices, the system knows in what format each subscriber is to receive the output. While there may be instances where the output is sent in the same format to all of the subscribers, because they all utilize the same output device type, the system does not recognize this fact at the outset. Instead, as the system processes through the list of subscribers, it determines the format based on the associations contained in that list between the devices and their device-specific style, and then sends the output in that format. It does not assume, as the defendants' system would, that all the subscribing devices are of the same device type and simply format each message identically, automatically, without checking for each device what style to utilize. This approach to styles and formatting with styles makes sense when viewed in light of the claim language, the specification, and the intent behind the patent.

a. *The Claim's Plain Meaning*

■ "The claim construction inquiry .... begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1248 (Fed.Cir.1998). "The terms used in the claims bear a 'heavy presumption' that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art." *Texas Digital Systems, Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1202 (Fed.Cir.2002). In the present case, the parties do not argue that the common language employed carries a particular meaning in the business intelligence industry or to one skilled in software engineering. In ascertaining ordinary meaning, a court may rely on dictionary definitions for assistance. *See Nystrom v. Trex, Inc.,* 374 F.3d 1105, 1111 (Fed.Cir.2004).

Claim element three provides that "each user device subscribed to that service is associated with a device-specific style that designates the format in which that particular type of user device is to output to the service outputs to a user [sic] to maintain the integrity of the service outputs ...." Claim element five describes the step of "creating a device-specific formatted output for each user device subscribed to the service selected to receive the output according to a selection of predefined values specified for each of a plurality of predefined parameters provided by the style specified for the user output device ...." According to this language, (1) *each* user device is *associated* with a device-specific style, and (2) output is created for *each* user device according to the style *specified for* the user output device.

■ The court concludes that the word choice and structure of each element points to a plain meaning that requires that the system or method function on a device-by-device basis. As one district court has noted, "the ordinary meaning of the word 'each' is 'every one of two or more considered individually or one by one.'" *Medtronic, Inc. v. Guidant Corp.,* 2004 WL 1179338, at *42 (D.Minn.2004) (unpublished) (quoting *The Random*

*House College Dictionary* 414 (rev.ed. 1982)). The court has consulted two dictionaries, *Webster's Third New International Dictionary* and the *Merriam Webster Collegiate Dictionary,* both providing a similar definition. The court concurs with this definition and concludes that it suggests, in concert with the overall structure of the elements, that the method employed is one wherein the devices are considered individually, rather than as part of the group they compose.

Specifying that each user device is associated with a style clarifies that there can be no association between a style and a service. An association between a style and a service would be an indirect or implicit relationship. The court believes use of the term "associated" requires a concrete, direct, explicit relationship. That term is defined as joined, combined, united, or brought together in a relationship, which denotes something more than an abstract or attenuated link between two things. *See Webster's Third New International Dictionary* 132; *Merriam Webster's Collegiate Dictionary* 70 (10th ed.1993). It might be that there is an indirect, or implicit relationship (an "association") between a device-specific style and the devices subscribed to the service; however, the court believes the wording of claim element three requires a direct, or explicit association between the device style and the subscribing devices. In other words, use of the word "associated" and the structure of the element denotes an active process whereby the system employing the patented method creates a link between each output device, individually, and a particular device-specific style. The association that occurs must be done on a device-by-device basis, rather than based on the entire group of devices or based on the service that is created. There could be no association between a service and a style. Furthermore, use of the term *device-specific* style suggests that a style that is set

when a service is created would not fit the designation "device-specific;" it would be "service-specific."

A similar analysis controls the interpretation of element five, which states that output is created according to a style specified for each device. Again, use of the words "specified" and "each" denotes an active, individualized process whereby the system generates output on a device-by-device basis, rather than generating a single type of output, multiple times, based on a style set for a service or for a group of subscribing output device, and then transmitted to all of the devices.

### b. *The Specification*

■ Nothing in the specification upsets the court's conclusions regarding the plain meaning of the relevant claim elements. The court relies on language from the specification relating to the "invention" rather than an embodiment of the invention in order to avoid improperly reading a limitation into the claims from an embodiment. The court believes that the invention itself, rather than any narrower permutations of the invention, suggests that it operates in the manner described. The primary evidence is the guiding purpose of the invention, which appears to be one of permitting a system to transmit output to multiple device types, although the invention may not actually require that a system do so. Despite the potential absence of such a requirement, the claim language has still been structured with this purpose in mind. In other words, the manner in which the claims describe the association of a device-style with each device, rather than service-based associations or subscriber-wide associations, makes sense given the patent's goal of a system that permits multiple styles for multiple devices. The use of an invention's "purpose" in claim construction is a somewhat danger-

ous exercise, but permissible under the right circumstances. *See E–Pass Techs., Inc. v. 3Com Corp.,* 343 F.3d 1364, 1370 (Fed.Cir.2003); *Apple Computer, Inc. v. Articulate Sys., Inc.,* 234 F.3d 14, 25 (Fed. Cir.2000) (*cited in E–Pass Techs.*). In the instant case, the court believes its use of the specification is proper.

The patentees' "invention" is a system that permits the transmission of service output to disparate device types, as the patent's Title, "System and method of adapting automatic output of service related OLAP reports to disparate output devices," indicates. While the court is aware that little or no weight is placed on the title of a patent when construing claims, the title is consistent with the court's interpretation of the structure of the claim language. Again, the court also clarifies that it is not importing a limitation from the title any more than it has imported a limitation from the specification into its interpretation of the claim language. *See Pitney Bowes, Inc. v. Hewlett–Packard Co.,* 182 F.3d 1298, 1312 (Fed.Cir.1999). True enough, there is a fine line between interpreting claims in light of the specification and reading a limitation from the specification into a claim, and courts often intend the former while being found to have done the latter.

The Abstract to the '050 patent states that the system "formats the service output according to styles specified for each user output device …." The Summary of the Invention indicates that two objectives of the invention are to (1) provide a system that broadcasts reports to any type of output device and (2) provide a system that outputs messages to multiple types of devices. For example, the summary states that an object of the invention is

to provide a system that utilizes configurable code that enables the system to

be readily adapted to output messages in the format of any type of electronic user output device. Another object of the present invention is to provide a system that outputs messages to multiple types of [electronic communication systems] … in that output device's specified format using configurable code with parameters specified for the particular device.

'050 Patent, Cols. 3:60–4:6. In essence, the "invention" is structured keeping in mind that one of the objects, if not the principal object, of the invention is facilitating transmission to multiple device types. While the court is unwilling to state that to infringe a system or method must actually do so, the court believes the claim language has been structured in a way that limits the literal coverage of the patent to methods and systems that handles output devices on an individualized basis.[6] In other words, the patent covers methods and systems that retain associations between individual devices and device styles, for example, because only in that manner does the patent cover systems that handle multiple device types or customization of subscription features on a subscriber-by-subscriber or device-by-device basis.

The majority of the specification is devoted to describing the invention's capability of supporting multiple styles and device types for a particular service. In order to do so, the system must know for each device what style that type of device requires to successfully receive and display the output. When the claim language in element four speaks of utilizing device-specific styles in order to maintain the "integrity of the service outputs," it is impliedly referring to the necessity of distinguishing between each output device because each output device might be dif-

---

**6.** It may be that the patent does require that the system or method support multiple device types for a service, a resolution helpful to the court's analysis, but not required.

ferent. As a result, the system must internally possess a list of associations between each device and its particular device style, even if in a specific instance or system the service output might only be sent to multiple devices of the same device type. While it is not necessary that the devices always be different, the system or method described in the claims is structured to facilitate the transmission of the same output to multiple device types.

Furthermore, the association of a device style with particular devices rather than services as a whole also makes sense in light of other portions of the claims. The first element of the independent claims requires that the subscriber be permitted to specify a user output device at which to receive service output. This ability also suggests that the system must associate styles with devices because devices can be added after the service has been created, which could upset the integrity of the output if a device were added that conflicted with the service-associated style. The defendants suggest such a possibility exists in its own software as a recipient could enter an email address that operates via a server profile different from the one specified for the service as a whole. The invention's purpose is to prevent such a possibility by making associations between devices and the required device-specific style rather than at the service level.

The Publisher software is quite different from the invention. It only supports one style per publication. Consequently, it does not send output to multiple device types. It is clear that a publication associated with a Lotus email profile will not transmit to an output device based on Microsoft's email profile. The court finds it difficult to comprehend how software could infringe a patent that purports to enable the transmission of output to multiple device types when the allegedly infringing software can only transmit output to one

particular device type for each service. The structure of elements three and five only makes sense when viewed in light of the patent's focus on multiple device types. There would be no need to phrase element three in a manner that suggests assessing for each device what type it is and what style that type supports if the patent covers systems that are incapable of sending the same output to two different device types.

Regardless of the court's analysis pertaining to multiple device types, clearly, the claim language requires an association between devices and device-specific styles. Designating the style for a publication or service is not literally identical to a system or method that associates styles with devices.

### 3. The Output Determination Means

The defendants' primary argument relied on the interpretation of elements four and seven, which focus on the manner in which the system or method handles the alert versus periodic subscription determination—how the "determination means" functions. In its *Markman* analysis, the court did suggest that element seven appeared to describe a process in which a system walked through a list of output devices, making a determination for each rather than a determination for all devices at once regarding whether output should be sent. The construction of element seven is similar to those discussed above in that it uses similar language ("determines whether *each* user device") and suggests a similar result—that the system makes explicit determinations on an individualized basis and carries an explicit association between a device and its status as alert or periodic, rather than for a service or group of devices. However, given the court's difficulty with certain language in the specification suggesting that the determi-

nation could be made as a whole, the court refrains from relying on this argument as a basis for summary judgment, simply noting its strong suspicion that element seven functions in a manner requiring an individualized, device-by-device determination much like the device-specific style association described above.

## D. *The Applicability of the Doctrine of Equivalents*

Even if the software does not literally infringe, it may still be found to infringe under the doctrine of equivalents if there is "equivalence between those elements of the accused product and the claimed limitations of the patented invention that are not literally infringed." *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1316 (Fed.Cir.1999) (citing *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997)). Infringement occurs under the doctrine of equivalents if the difference between the particular element and the claim limitation are "insubstantial." *See id.* A test to determine "insubstantiality" is whether "the element performs substantially the same function in substantially the same way to obtain substantially the same result as the claim limitation." *See id.* at 1316–17 (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950)). In the present case, the court has carefully noted that the defendants' software does not literally read on the patent, specifically, elements three and five of the independent claims. However, it may be that the distinction between a system that makes an association between styles and individual devices and one that makes a service-based or device-wide association is, for all practical purposes, a distinction without a difference. Consequently, the defendants' software might infringe under the doctrine of equivalents.

The defendants have argued that the plaintiff is not entitled to invoke the doctrine of equivalents, focusing their argument on the output determination means detailed in elements four and seven. The defendants maintain that element seven of claims one and eight was added during prosecution of the patent; therefore, a presumption arises that the plaintiff is estopped from asserting that there is a range of equivalents that the patent covers. The court disagrees with this argument.

Clearly, the last element was added in order to obtain the patent. The very basis for the PTO's grant of a patent was the last element of the independent claims. However, it is also clear to the court that the record indicates that the difference between the literal operation of this element and the operation of the defendants' software was not the basis for the grant of the patent. In other words, the plaintiff was not forced to take a narrower construction in order to obtain the patent. The plaintiff could have worded the last element in a way that encompassed the operation of the defendants' software and have still obtained a patent.

The court is extremely familiar with the prosecution history of this patent as a result of its *Markman* analysis and is of the firm belief that the distinction between the scope of the final element and a system that operates in a manner similar to Publisher was irrelevant to the prosecution of this patent. The issue before the patent office was when the alert condition was evaluated, not whether the system made a subscriber-by-subscriber decision to send output or a subscriber-wide decision to send output. Although a presumption of estoppel does arise, the court agrees with the plaintiff's contention that the record before the court rebuts this presumption.

More problematic, however, is the fact that the plaintiff's expert on infringement, Dr. Franklin, has not opined in a sufficient manner regarding infringement under the doctrine of equivalents. Consequently, the court does not believe the plaintiff can rely on the doctrine of equivalents to prove infringement. As the Federal Circuit has stated: "The doctrine of equivalents is not a talisman that entitles a patentee to a jury trial on the basis of suspicion; it is a limited remedy available in special circumstances, the evidence for which is the responsibility of the proponent." *Schoell v. Regal Marine Industries, Inc.,* 247 F.3d 1202, 1210 (Fed.Cir. 2001).

In *Zelinski v. Brunswick Corp.,* 185 F.3d 1311 (Fed.Cir.1999), the Federal Circuit affirmed a district court's ruling that the plaintiff could not invoke the doctrine of equivalents because its expert stated in conclusory fashion that because there was literal infringement there was also infringement under the doctrine of equivalents. *See id.* at 1317. Similarly, Dr. Franklin's analysis for each element of the independent claims concerned literal infringement but was followed by the conclusory statement that there was also infringement under the doctrine of equivalents. The court concludes that the form of this report is essentially identical to the "analysis" deemed insufficient in *Zelinski,* and for similar reasons, the court concludes that the plaintiff in the instant case has not put forth sufficient evidence to establish a prima facie case of infringement under the doctrine of equivalents.[7]

### E. *Conclusion*

The plain meaning of elements three and five, describing the role and function of the device-specific style in the patent, require a specific association between each, individual, output device, and its particular style. A system must know, for each device, individually, what formatting style it requires. The specification does nothing to upset this plain meaning, and in fact, the object of the invention illuminates the rationale for this construction of the elements addressing device-specific styles.

The court has found that the defendants' software, Publisher, does not make such an association. Instead, it associates a format with a service or publication, without regard to what devices are subscribed to the service or publication. Consequently, the defendants' software does not literally infringe the patent. Furthermore, the court also concludes that the plaintiff cannot rely on the doctrine of equivalents as an alternative argument for infringement. As such, the plaintiff cannot prevail on its claim that the defendants have infringed the '050 patent.

### F. *Business Objects' Motion For Summary Judgment of Invalidity*

Because Business Objects cannot been found liable to MicroStrategy for infringement, the court need not address the merits of the defendants' motion for summary judgment of invalidity. The Federal Circuit has "held that a district court has discretion to dismiss a counterclaim alleging that a patent is invalid as moot where it finds no infringement." *Phonometrics, Inc. v. Northern Telecom, Inc.,* 133 F.3d

---

7. The court notes that the defendants also recognized the problematic nature of the expert report, having filed a motion to prevent the plaintiff from asserting the doctrine of equivalents on the basis of this report. The clear insufficiency of the report led the court to conclude that a full briefing and hearing on the matter was not required. Furthermore, the court was considering this issue a week prior to trial and the plaintiff would not have been permitted to supplement its expert report at such a late date.

1459, 1468 (Fed.Cir.1998). Therefore, the court will dismiss this claim, and the instant Opinion and Order shall constitute a final, appealable judgment in this matter.

### III. CONCLUSION

For the reasons discussed above, the defendants' motion for summary judgment of noninfringement is **GRANTED**. The plaintiff's motion for summary judgment of infringement is **DENIED**. The defendants' claim of patent invalidity is **DISMISSED**, and the motion for summary judgment of invalidity is **MOOT**. All other motions relating to the plaintiff's patent infringement claim and the defendants' invalidity counterclaim are **DISMISSED AS MOOT**.

The Clerk is **REQUESTED** to send a copy of this Order to counsel of record.

It is so **ORDERED**.